# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHRISTOPHER SIMENSON,

     Plaintiff,

     v.

CITY OF JOLIET, et. al.,

     Defendant.

Case No. 18-cv-00608

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Simenson sues Defendants City of Joliet, Joliet Police Department (JPD) Officer Nicholas Crowley, and JPD Officer D. Weis based upon events that transpired following a 911 call on May 28, 2016. [1] ¶¶ 9–38. Defendants move for partial summary judgment on Counts I and III of Plaintiff's complaint. [35]. Counts I and III allege that Officer Crowley: (1) illegally seized Plaintiff in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 (Count I); and (2) maliciously prosecuted Plaintiff in violation of Illinois state law (Count III). [1] ¶¶ 39–44, 51–57. For the reasons explained below, this Court grants Defendants' motion.

## I. Background

The following facts come from Defendants' LR 56.1 statement of material facts, [37], Plaintiff's response to Defendants' statement of material facts, [46], Plaintiff's statement of additional facts, [45], and Defendants' response to Plaintiff's statement of additional facts, [47].

## A. The 911 Call

Plaintiff resides in Will County, Illinois. [37] ¶ 1. Defendant Crowley has served as a police officer for Joliet since 2013. *Id.* ¶ 2.

Minutes after midnight on May 28, 2016, John Torres—a security guard for Harrah's Joliet Hotel & Casino—called 911 to report that he encountered a male subject on casino property who said he planned to jump off nearby Jefferson Street Bridge. *Id.* ¶ 3. Torres remained on the phone with the 911 dispatcher as the dispatcher relayed the call's substance to JPD and confirmed that the officers approached the correct subject. *Id.* ¶ 4. JPD Officers Crowley, Luis Ayala, and Sergeant Tim Powers, among others, responded to the scene after hearing the 911 dispatch that an individual was threatening to commit suicide by jumping off the Jefferson Street Bridge. *Id.* ¶ 5. Joliet Fire Department paramedics Mark Boros and Tyler Wilson also responded to the scene. *Id.* ¶ 6. Officer Crowley, Sergeant Powers, Boros, and Wilson all knew from personal experience that the Jefferson Street Bridge serves as a suicide "hot spot." *Id.* ¶ 8.

Officer Ayala arrived on the scene first, followed shortly thereafter by Boros, Wilson, and Officer Crowley. *Id.* ¶ 9. Upon arrival, they saw Plaintiff sitting on a bench beside the river, yards from the Jefferson Street Bridge. *Id.* Sergeant Powers served as the on-scene supervisor for JPD and initially watched the scene from across the street so as to not interfere. *Id.* ¶ 7.

While Plaintiff continued sitting on the bench, Officer Ayala, Boros, and Wilson began speaking to him; Officer Crowley did not speak to Plaintiff at this time. *Id.* ¶

10. Defendants maintain that Simenson appeared visibly intoxicated throughout the conversation; Plaintiff counters that he "wasn't really drunk," but "had some alcohol in" him. *Id.* ¶ 11; [46] ¶ 11; [37-1] at 55. Regardless, Plaintiff concedes that he drank "numerous 'mugs' of beer earlier in the day." [37] ¶ 11. When the JPD officers approached Plaintiff, he also had a backpack containing a six pack of beer in his possession. *Id.* ¶ 12. Plaintiff told the JPD officers that he had been drinking and made statements to the effect that he "need[ed] some help," wanted to get into rehab, and wanted to quit drinking. *Id.* ¶ 13; [37-1] at 35, 53.

While Plaintiff still sat on the bench, Boros and Wilson, in their role as paramedics, determined that they needed to take him to the hospital. *Id.* ¶ 14; [37-4] at 20; [37-5] at 10, 45. They made this decision based upon: (1) the 911 call reporting a suicidal individual; (2) the Jefferson Street Bridge's reputation as a suicide "hot spot"; (3) evidence of Plaintiff's alcohol consumption; and (4) Plaintiff's statement that he needed help. *Id.* ¶ 16. Boros and Wilson did hear Plaintiff deny being suicidal, but did not change their determination given: (1) the circumstances of the 911 call; (2) their standing medical orders; and (3) their experience as paramedics, including circumstances in which individuals had denied suicidal thoughts despite showing evidence of self-harm. *Id.* Accordingly, Boros and Wilson believed that a qualified mental health professional needed to further evaluate Plaintiff. *Id.* ¶ 17; [37-4] at 15, 57–58; [37-5] at 13–15.

Boris and Wilson testified that upon arriving to a scene involving a suicidal patient, they usually explain to the patient that he or she can come to the hospital

willingly, or the paramedics will take him or her to the hospital in protective custody. [37-4] at 62−63; [37-5] at 51−52. In this case, however, Boros and Wilson could not recall whether they explained these two options to Plaintiff. *Id*. According to Plaintiff, Boros and Wilson "nicely" asked him if they could take him to the hospital and never advised him that he had no choice but to go. [45] ¶ 7; [46] ¶¶ 14, 20; [37-1] at 32, 36.

Eventually, Plaintiff entered the ambulance voluntarily and had his vital signs checked. [37] ¶ 21; [45] ¶ 3. While in the back of the ambulance, Plaintiff cooperated with Boros and Wilson, and both paramedics testified that he behaved in a calm manner. [45] ¶ 7. Sometime after entering the back of the ambulance, Plaintiff saw Officer Crowley for the first time. [37] ¶ 22. Officer Crowley heard Plaintiff deny making suicidal threats. [45] ¶ 5.

While the paramedics checked Plaintiff's vital signs in the ambulance, Officers Crowley and Ayala searched through his backpack—outside of the ambulance—as part of standard security protocol and at the request of the paramedics; in doing so, they found alcohol in Plaintiff's bag. [37] ¶ 23. Plaintiff then became "agitated" and "angered," and stated that he wanted to bring his alcohol and bag with him into the ambulance. *Id*. ¶ 24; [37-3] at 17; [37-5] at 21−24. Plaintiff then stated that he wanted to go home, rather than to the hospital, and left the ambulance. [37] ¶ 25. While the parties dispute exactly what Officer Crowley told Plaintiff before he left the ambulance, the record demonstrates that Office Crowley, at the very least, told

Plaintiff that he would go to the hospital either voluntarily or in handcuffs. [37] ¶ 27; [37-1] at 38; [37-2] at 33; [46] ¶ 27.

Following Plaintiff's exit from the ambulance, a physical altercation occurred between him and Officer Crowley. [37] ¶ 29. According to Plaintiff, Officer Crowley tackled him, and in the process Plaintiff's face hit the corner of a metal box. [37-1] at 38−39. According to Officer Crowley, after he gave Plaintiff the option to go to the hospital voluntarily or in handcuffs, Plaintiff turned around and put his hands behind his back, telling Officer Crowley "fine; then fucking handcuff me." [37-2] at 34. Officer Crowley maintains that he put one handcuff on Plaintiff's wrist before Plaintiff pulled away from him and twisted his torso towards the ambulance door; Officer Crowley then used his body weight to get him onto the floor of the ambulance to control his movements. *Id*. Defendants concede that in this process, Plaintiff struck his head on a metal box and cut his cheek. [37] ¶ 31. Following the altercation, Boros and Wilson tended to Plaintiff's cut cheek in the ambulance and controlled the bleeding. [37] ¶ 32; [37-4] at 38. Officer Crowley placed handcuffs on Plaintiff while he remained on the floor of the ambulance, but while Plaintiff received treatment, only one hand remained handcuffed. [45] ¶¶ 17−18.

Sergeant Powers, still watching from a distance, heard loud speech and saw a commotion at the side of the ambulance, but did not see anything specific. [37] ¶ 33. He then walked to the back of the ambulance and discussed what had occurred with Officers Crowley and Ayala. *Id*. Following this conversation, Officer Crowley also

decided to arrest Plaintiff for misdemeanor resisting or obstructing a police officer. *Id.* ¶ 34.

Boros and Wilson then took Plaintiff in custody to Presence St. Joseph's Hospital for medical treatment. *Id.* ¶ 35. Specifically, they took him to Pod D of the Emergency Room—the Emergency Room's psychiatric section. *Id.* Plaintiff arrived at the hospital at 12:52 a.m. *Id.* Plaintiff was then released from police custody on a recognizance bond, known as an I-Bond, at 2:05 a.m., but remained at the hospital for treatment for four additional hours. *Id.* ¶ 36; [45] ¶ 21. Nurse Mark Wales, who treated Plaintiff, stated that Plaintiff was "very threatening" in the hospital. [37] ¶ 37; [37-10] at 12.

Wales also testified that based upon his observations and training, Plaintiff was heavily intoxicated and not capable of making decisions. [37] ¶ 39. Plaintiff denies that he behaved uncooperatively, [37-1] at 69, but concedes that his behavior in the Emergency Room caused security officers and crisis intervention specialists to respond and handle him, [37] ¶ 38. While at the hospital, tests revealed that Plaintiff had a blood alcohol content (BAC) level of .242. *Id.* ¶ 42.[1] Ultimately, Dr. Kim Orlob treated the cut on Plaintiff's face at 5:05 a.m. by closing it with glue in a "simple

---

[1] Plaintiff argues that this Court cannot admit his BAC level into evidence at the summary judgment stage. [46] ¶ 42. Specifically, he argues that proof of Plaintiff's BAC "cannot be presented in a form admissible at trial because the relevance of the blood alcohol content is predicated upon expert testimony explaining if, why, and how blood alcohol content is an accurate indicator of the degree of intoxication." *Id.* But Plaintiff provides no caselaw to support his conclusion that this Court cannot consider Wales' testimony regarding Plaintiff's BAC level without expert testimony on summary judgment. [37-10] at 36; *see generally* [44]. Rather, caselaw demonstrates that courts can and do so. *See, e.g.*, *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (taking into consideration, in an illegal seizure analysis, that plaintiff maintained a BAC of .298).

repair." *Id.* ¶ 43. The parties agree that Plaintiff ultimately never received a mental health evaluation before leaving the hospital at 5:55 a.m. *See* [44] at 5; [37] ¶ 43.

### B.   Plaintiff's Criminal Prosecution

Following the 911 call and subsequent incident, Officer Crowley filled out reports to generate the misdemeanor criminal complaint against Plaintiff. *Id.* ¶ 44. Officer Crowley's case report stated that with regard to the incident—he listed the subject line of the report as "suicide"—the disposition was "unfounded." [45] ¶ 5; [45-1]. In his testimony, Officer Crowley said he incorrectly input "unfounded"—by clicking on the wrong option in a dropdown menu—when filling out the report. [47] ¶ 5; [37-2] at 114. The case against Plaintiff was assigned to the Circuit Court of Will County; Plaintiff hired an attorney and went to court on February 14, 2017—the day the court set his case for a jury trial. [37] ¶¶ 45−46. Officer Crowley also received notification to be in court that day. *Id.* ¶ 50. Assistant State's Attorney (ASA) Jaclyn Sopcic handled the misdemeanor cases in the courtroom where Plaintiff's case had been assigned on February 14, 2017. *Id.* ¶ 48.

Due to the high volume of cases in her courtroom, Sopcic did not look at Plaintiff's case file prior to February 14, 2017. *Id.* ¶ 49. That morning, Sopcic saw Officer Crowley in the courtroom, recognized him from previous cases, realized that Plaintiff's case listed him as the relevant officer, and thus answered "ready" for jury trial when the judge called the case shortly after 9:00 a.m. *Id.* ¶ 51. After answering ready, Sopcic spoke with Officer Crowley and permitted him to leave, as misdemeanor juries in that courtroom at the time were customarily called for jury selection that

afternoon, and opening statements and testimony the next day. *Id.* ¶¶ 52, 55. Sopcic also instructed Officer Crowley to stay within 10 minutes of the courthouse in case Plaintiff—defendant in that case—requested a bench trial instead, in which case testimony would begin that same day. [45] ¶ 27; [40] at 16−17, 21; [40] (Ex. 2 at 6). After this conversation, Officer Crowley left the courthouse. [37] ¶ 56.

Sometime after Officer Crowley left the courthouse, Plaintiff waived his right to a jury trial and asked for a bench trial instead. *Id.* ¶ 58. Sopcic then called Officer Crowley, who informed her that despite her instructions to stay within ten minutes of the courthouse, he had left the area and could not return that day. [40] at 21, 28. According to Sopcic, Officer Crowley told her that he was in Chicago and could not return. [45] ¶ 29. As such, Sopcic was not ready for a bench trial. [37] ¶ 59; [40] at 23. Based upon her experience, Sopcic knew that some trial judges allowed the prosecution a continuance in cases when defendants answered "ready" for jury trial, but then elected to have a bench trial instead, and the prosecution had already released its witness. [37] ¶ 60. Sopcic therefore moved for a continuance, but the trial judge denied the motion. *Id.* ¶¶ 62−63. Accordingly, Sopcic dismissed the case via a motion to *nolle prosequi*. *Id.* ¶ 63.

## II.    **Legal Standard**

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56.

A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Analysis

### A. Count I: Unlawful Seizure

Count I alleges that Officer Crowley "meaningfully interfered with Plaintiff's freedom of movement," thus unlawfully seizing him in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983. According to Plaintiff, this case involves two separate seizures. First, Plaintiff argues that Officer Crowley unlawfully seized him, under the guise of an involuntary mental health commitment, when he "refused to return [Plaintiff's] backpack, spun him around, shoved him into the gun box, and handcuffed him." [44] at 4. Second, Plaintiff argues that Officer Crowley's decision to arrest Plaintiff, following this incident, for resisting a police

officer, constituted a separate seizure lacking probable cause. *Id.* at 7. This Court analyzes each argument in turn.

To succeed on a Section 1983 claim, a plaintiff must show that: "(1) the party against whom the claim is brought qualifies as a 'person acting under the color of state law'; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or immunities under the Constitution or the laws of the United States." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397 (7th Cir. 2005) (internal citation omitted). Here, neither party disputes that Officer Crowley, as a JPD police officer, acted under color of state law during his encounter with Plaintiff. Therefore, the only issue remains whether Officer Crowley caused or participated in a constitutional deprivation. *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (1983)).

Defendants move for summary judgment based upon multiple grounds, maintaining that: (1) Officer Crowley did not cause Plaintiff's detention; (2) probable cause existed requiring Plaintiff to submit to a mental health evaluation; (3) in any event, qualified immunity protects Officer Crowley; and (4) Plaintiff failed to plead his unlawful arrest claim, and thus cannot amend his complaint at summary judgment. [36] at 6–10; [48] at 3.

### 1.    Involuntary Health Commitment Seizure

### a.    Officer Crowley Caused Plaintiff's Detention

First, Defendants argue that because paramedics Boros and Wilson lawfully seized Plaintiff before he encountered Officer Crowley, Plaintiff's detention "was a

*fait accompli* long before Crowley entered the picture." [36] at 6−7. Plaintiffs respond that Boros and Wilson did not seize Plaintiff. [44] at 4. This Court agrees with Plaintiff and finds that Officer Crowley seized him within the meaning of the Fourth Amendment.

Defendants argue that while Plaintiff sat on the bench beside the Jefferson Street Bridge," Boros and Wilson decided they needed to take him to the hospital for a mental health evaluation, and thus Plaintiff remained under their detention throughout his interaction with Officer Crowley. [48] at 2; *see also* [36] at 6−7; [44] at 3−4. But under the Fourth Amendment, applicable to the states through the Fourteenth Amendment, "a person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Tom v. Voida*, 963 F.2d 952, 956−57 (7th Cir. 1992) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Here, the record demonstrates that: (1) neither Boros nor Wilson remembers whether they told Plaintiff that if he did not go to the hospital willingly, they would take him there in protective custody, [37-4] at 62−63; [37-5] at 51−52; (2) according to Plaintiff, Boros and Wilson "asked" him "nicely" if "it would be okay" to take him to the hospital, [45] ¶ 7; [46] ¶¶ 14, 20; [37-1] at 32, 36; (3) Boros and Wilson described their interaction with Plaintiff as cooperative, [45] ¶ 7; (4) Plaintiff entered the ambulance voluntarily, *id*. ¶ 3; [37] ¶ 21; and (5) Plaintiff left the ambulance before Officer Crowley handcuffed him, [37] ¶ 25. Accordingly, taking the facts in Plaintiff's favor, the record indicates that Plaintiff not only *felt* free to leave Boros and Wilson's

presence due to the cooperative nature of their interaction, but *did* in fact leave the ambulance prior to the incident with Officer Crowley. Therefore, this Court cannot find that a reasonable person would have felt unable to leave their presence.

Next, this Court turns to whether Officer Crowley seized Plaintiff. Section 1983 creates a cause of action "based upon personal liability and predicated upon fault"; an individual "cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Jenkins*, 147 F.3d at 583 (quoting *Wolf-Lillie*, 699 F.2d at 869). Here, the record demonstrates that at the very least, Officer Crowley: (1) told Plaintiff he would go to the hospital either voluntarily or in handcuffs, [37] ¶ 27; [37-1] at 38; [37-2] at 33; [46] ¶ 27; and (2) handcuffed Plaintiff when he declined to go voluntarily, [45] ¶¶ 17−18. Based upon the undisputed portions of the factual record, Officer Crowley seized Plaintiff within the meaning of the Fourth Amendment. *Tom*, 963 F.2d at 956−57.

### b.    Officer Crowley Possessed Probable Cause

Next, the parties dispute whether Officer Crowley seized Plaintiff based upon probable cause, and if not, whether qualified immunity applies. With respect to probable cause, Defendants argue that Plaintiff's detention falls under the "exigent circumstances" exception allowing warrantless seizures based upon reasonable fear that an individual might commit suicide. [36] at 7. Plaintiff, on the other hand, argues that a reasonable officer would not have concluded Plaintiff was suicidal and/or required a mental health evaluation. [44] at 4−5.

Courts analyze seizures made to effectuate an involuntary mental health commitment under the Fourth Amendment's "probable cause" standard. *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013) (citing *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992)). Probable cause exists "only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Id.* In Illinois, 405 ILCS 5/3-606 provides that legal standard:

> A peace officer may take a person into custody and transport him to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm.

*Id.* This inquiry requires objectivity; an officer's subjective motivations do not invalidate a Fourth Amendment action otherwise supported by probable cause. *Id.* (citing *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010)). Thus, this Court must determine whether Officer Crowley possessed objectively reasonable grounds for believing that Plaintiff required immediate hospitalization to protect him from self-harm. *Id.*; *see also Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015) ("Generally speaking, a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself for others.").

Here, the record demonstrates that Officer Crowley possessed objectively reasonable grounds to seize Plaintiff. First, the incident occurred at a bridge known as a suicide "hot spot." [37] ¶ 8. An identified security guard made the 911 call reporting that an individual planned to jump off the bridge, and the paramedics and officers found Plaintiff exactly where the guard stated the subject would be located.

*Id.* ¶¶ 3−7.  Moreover, the security guard remained on the line with the dispatcher to confirm that the officers located the correct person.  *Id.* ¶ 4.  Plaintiff concedes that he had been drinking and had alcohol in his possession; Officer Crowley discovered this alcohol, and he made on-scene observations of Plaintiff's intoxication (indeed, Plaintiff concedes that later tests at the hospital revealed a BAC of .242).  *Id.* ¶¶ 13, 23, 42; [37-2] at 32; [37-1] at 35, 53; *see also Fitzgerald*, 707 F.3d at 733 ("As a point of comparison, the legal blood alcohol limit to drive in the state of Illinois is .08.") (citing 625 ILCS 5/11-501).  At the scene, Plaintiff become "agitated" and "angered" and stated that he wanted to bring his bag of alcohol with him into the ambulance. *Id.* ¶ 24; [37-3] at 17; [37-5] at 21−24.  In short, the 911 call matched to Plaintiff's description, Plaintiff's physical location next to the suicide "hot spot," the evidence of his excessive alcohol consumption, and subsequent agitation all weigh in favor of finding Officer Crowley's seizure objectively reasonable.  *See Fitzgerald*, 707 F.3d at 729, 733 (finding probable cause existed for an involuntary mental health commitment where plaintiff "was unsteady on her feet and possibly intoxicated," "admitted to being upset" and "called a local police station and made suicidal statements" but denied wanting to harm herself when officers arrived on the scene).

Plaintiff counters that Officer Crowley lacked probable cause because: (1) he heard Plaintiff deny making suicidal threats; (2) the subsequent arrest report lists the particular complaint of suicide as "unfounded"; and (3) Plaintiff never received a mental health evaluation at the hospital.  [44] at 5.  On the first point, the plaintiff in *Fitzgerald* similarly denied wanting to harm herself once officers arrived on the

scene; there, the Seventh Circuit found a similar, on-scene denial unpersuasive given that she had earlier made suicidal statements, appeared intoxicated, and otherwise indicated that she "was going through a difficult period" and taking anti-depressants. *Id.* at 733; *see also Dunne v. Reda*, No. 12 C 872, 2013 WL 617077, at *3 (N.D. Ill. Feb. 19, 2013) ("Most people facing involuntary hospitalization deny that they need medical attention; if a simple denial were enough, probable cause would never exist.").

With respect to what did or did not occur after the seizure took place—the subsequent arrest report "unfounded" comment and the absence of a follow-up mental health evaluation at the hospital—the Seventh Circuit instructs that courts "must examine the uncontested facts as the officers knew them" at the time the incident occurred, not after the fact. *Fitzgerald*, 707 F.3d at 733; *Rusinowski v. Vill. of Hillside*, 19 F. Supp. 3d 798, 808 (N.D. Ill. 2014) (explaining that when conducting a probable cause analysis of a mental health seizure, "the officer's actions are judged based on the information known to the officer at the time.").

Lastly, Plaintiff argues that the physicality of Officer Crowley's seizure demonstrates that it "was not for benevolent reasons." [44] at 6. But the probable cause inquiry must remain objective; an officer's subjective motivations cannot invalidate a seizure otherwise supported by probable cause. *Fitzgerald*, 707 F.3d at 732 (citing *Carmichael*, 605 F.3d at 457). Thus, Officer Crowley's subjective reasons for seizing Plaintiff remain irrelevant. Moreover, Plaintiff's excessive force claim

with respect to this seizure, [1] ¶¶ 45–50, is not before this Court on Defendants' present motion.

Accordingly, this Court finds it objectively reasonable for Officer Crowley to have believed that, in the absence of Plaintiff's cooperation, he needed to seize Plaintiff to prevent him from physically harming himself. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 551 (7th Cir. 2014) (explaining that courts "have long recognized the important role that police play in safeguarding individuals from dangers posed to themselves and others").

In light of the above, this Court further finds that Defendants' remain entitled to qualified immunity on this claim as well. *See Bruce*, 777 F.3d at 878 (explaining that when an action's constitutionality depends upon a probable cause finding, an officer is "entitled to qualified immunity when a reasonable officer could have reasonably believed that probable cause existed in light of well-established law.") (internal quotations omitted).

### 2. Officer Crowley Seized Plaintiff On-Scene

Plaintiff's response memorandum also argues that a separate seizure, distinct from the seizure for an involuntary mental health commitment discussed above, precludes summary judgment. [44] at 7–8. Specifically, he argues that even if Officer Crowley lawfully seized Plaintiff pursuant to a mental health emergency, summary judgment remains inappropriate because a factual dispute exists regarding the legality of Plaintiff's subsequent formal arrest on criminal charges. *Id*. at 7. According to Plaintiff, the parties dispute whether Officer Crowley's basis for the

resisting arrest charge—that Plaintiff pulled away from him when he attempted to handcuff him—occurred, and thus a triable issue remains as to whether Officer Crowley possessed probable cause for arresting Plaintiff on that charge. *Id.* Defendants argue that Plaintiff failed to plead his unlawful arrest claim, and thus cannot amend his complaint at summary judgment. [36] at 6–10; [48] at 3. This Court need not address Defendants' pleading argument, however, because the factual record reveals only one Fourth Amendment seizure.

Here, the decision to file formal criminal charges against Plaintiff fails to constitute a separate seizure requiring a distinct probable cause analysis.[2] Rather, as discussed above, once Officer Crowley told Plaintiff he would go to the hospital either voluntarily or in handcuffs, [37] ¶ 27; [37-1] at 38; [37-2] at 33, Officer Crowley had seized Plaintiff within the meaning of the Fourth Amendment. *Tom*, 963 F.2d at 956–57. The subsequent events, including Officer Crowley's decision to charge Plaintiff, simply flowed from that original physical seizure. Thus, because this Court finds that Officer Crowley possessed probable cause to seize Plaintiff for purposes of an involuntary health commitment, this Court need not conduct a separate probable cause analysis as to legality of the other criminal charges later placed on Plaintiff.

---

[2] As the Seventh Circuit discussed in *Mitchell v. City of Elgin*, 912 F.3d 1012, 1016–17 (7th Cir. 2019), the conditions upon which an individual is released on bond may, under certain circumstances, constitute a "seizure" for Fourth Amendment purposes. Here, however, Plaintiff makes no argument that the conditions of his I-bond release themselves resulted in any sort of seizure, nor does the record contain any mention of the terms of Plaintiff's I-bond release, aside from presumably appearing in court for his criminal case. *See generally* [37] [45]; *Mitchell*, 912 F.3d at 1017 ("We have misgivings about construing a simple obligation to appear in court—a uniform condition of any pretrial release—as a 'seizure' for Fourth Amendment purposes."). As such, the record before this Court contains no inference of any distinct seizure related to Plaintiff's later I-bond release on misdemeanor criminal charges.

*See, e.g.*, *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("An arrested individual is no more seized when he is arrested on three grounds rather than one; and so long as there is a reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed.") (citing *Devenpeck v. Alford,* 543 U.S. 146, 153–55 (2004) and *Wagner v. Washington Cty*, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam)); *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1102 (S.D. Ind. 2008) ("Where an individual is arrested on multiple charges, a finding of probable cause for any of the charges is sufficient to negate a § 1983 claim for false arrest.") (citing *Ochana v. Flores*, 347 F.3d 266, 271 (7th Cir. 2003)).

In short, the record shows that Officer Crowley placed Plaintiff in custody just once when he took Plaintiff to the hospital for purposes of an involuntary health commitment, and then subsequently released Plaintiff on a personal recognizance bond for the separate criminal charges. As such, Plaintiff fails to establish a separate, unlawful seizure under the Fourth Amendment. This Court grants Defendants' motion for summary judgment as to Count I.

### B. Malicious Prosecution

To succeed on a malicious prosecution claim under Illinois law, a plaintiff must show: (1) the defendants commenced or continued a criminal prosecution against him; (2) the proceeding terminated in the plaintiff's favor; (3) the defendants lacked probable cause to proceed against him; (4) the defendants proceeded with malice; and (5) the plaintiff suffered damages. *Boyd v. City of Chicago*, 880 N.E.2d 1033, 1045

(Ill. App. Ct. 2007). For purposes of summary judgment, Defendants dispute only the second element: whether the underlying criminal proceeding terminated in Plaintiff's favor. [36] at 11. Specifically, Defendants argue that because ASA Sopcic dismissed the case via a motion to *nolle prosequi* due to Officer Crowley's unavailability, the dismissal did not constitute a "favorable termination." *Id.*

Under Illinois law, the State's decision to *nolle prosequi* a criminal charge "does not necessarily constitute a favorable termination allowing that plaintiff to, in turn, establish a claim for malicious prosecution." *Coleman v. Vill. of Evergreen Park*, No. 1-16-1492, 2017 IL App (1st) 161492-U, at *18 (Ill. App. Ct. 2017). Rather, whether a plaintiff can establish a malicious prosecution claim "depends upon the circumstances under which the proceedings are withdrawn." *Id.* (citing *Swick v. Liautaud*, 662 N.E.2d 1238, 1242−43 (Ill. 1996)).

In *Swick*, the Illinois Supreme Court held that "a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." 662 N.E.2d at 1242. The court then clarified that reasons not indicative of innocence include: (1) an agreement or compromise with the accused; (2) misconduct on the part of the accused to prevent trial; (3) mercy requested or accepted by the accused; (4) the institution of new criminal proceedings; or (5) the impracticability of bringing the accused to trial. *Id.* at 1243. The burden to prove a favorable termination, however, remains with the plaintiff. *Id.* Accordingly, only when a plaintiff establishes that a *nolle prosequi* "was entered for

reasons consistent with his innocence does the plaintiff meet his burden of proof." *Id.* In other words, the circumstances surrounding the abandonment of the criminal proceedings must "compel" an inference that the State lacked reasonable grounds to pursue criminal prosecution. *Id.*

Here, the undisputed facts demonstrate that Sopcic did not move for a *nolle prosequi* dismissal for reasons consistent with Plaintiff's innocence. Rather, the record reveals that Sopcic requested a continuance because Officer Crowley was not present, and when the judge denied her motion, Sopcic dismissed the case via a motion to *nolle prosequi.* [37] ¶¶ 63–64; *see also, e.g., Yuming Deng v. Sears, Roebuck & Co.*, 2007 WL 4643884, at *2 (N.D. Ill. Aug. 28, 2007) (granting motion for summary judgment on malicious prosecution claim where ASA requested a continuance because witness scheduled to testify against Plaintiff was not present, and the "sole reason" for ASA's subsequent *nolle prosequi* dismissal was the judge's refusal to grant the continuance) (*aff'd*, 552 F.3d 574) (7th Cir. 2009); *Bowlds v. Viciego*, No. 2-14-0065, 2015 IL App (2d) 140065-U *35 n.2 (Ill. App. Ct. 2015) ("The unwillingness of a witness to testify can be quite unrelated to whether the State had reasonable grounds to pursue the prosecution.").

Further, Plaintiff provides no evidence to indicate that Sopcic abandoned the case because she believed Plaintiff was innocent or thought the State's evidence could not convict him. Rather, Plaintiff argues that Officer Crowley's conflicting deposition testimony demonstrates he "purposefully made himself unavailable at trial to avoid testifying because he fabricated the alleged charge against" Plaintiff. [44] at 14–15.

But Officer Crowley's testimony—that he told Sopcic he had other matters in the courthouse and could not return that day, [37-2] at 91—to the extent it conflicts with Sopcic's testimony—that she told Officer Crowley to stay nearby but he then left for Chicago, [40] at 21−23—indicates, at most, a basis for speculation, not a genuine issue of fact. *See, e.g., Bowlds*, 2015 IL App (2d) at *35 (affirming summary judgment against plaintiff on malicious prosecution claim where plaintiff "raised not a genuine issue of fact, but only a basis for speculation" as to the reasons for a *nolle prosequi* order).

Based upon this record, Plaintiff fails to raise a triable issue of fact as to whether the criminal proceedings terminated in a manner consistent with his innocence. Therefore, this Court grants summary judgment as to Plaintiff's malicious prosecution claim (Count III).

## IV.  Conclusion

For the reasons stated above, this Court grants Defendants' partial motion for summary judgment. [35]. This Court grants Defendants' motion as to Count I and Count III. All dates and deadlines stand.


Dated: August 7, 2019

Entered:

John Robert Blakey
United States District Judge
